## The heirs of STEPHEN HINDS *v.* BENJAMIN SCOTT and ———— BELL.

1. Where one suffers his land to be sold upon an execution, the judgment upon which it issued being more than five years old and not revived by *scire facias*, neither he nor those claiming under him can afterwards, in a collateral proceeding, be permitted to call in question the validity of the sale.

2. The non-return of the execution, upon which the sheriff makes a sale, will not affect the validity of his conveyance. His deed may be considered a return, and a misrecital in the deed of the *ven. ex.* is open to correction.

ERROR to the Common Pleas of Mifflin, being a special court held by President HEPBURN.

*May* 25. This was an action of ejectment brought by the heirs of Stephen Hinds against Scott and Bell. The plaintiffs proved title to have been in George Bell, against whom a judgment was entered by E. L. Benedict on the 24th September, 1829, as of November Term in that year. Upon this judgment there was issued a *fi. fa.* to

November Term, 1830, which was returned levied on the land in controversy; inquisition held and property condemned, December 4th, 1834. On the 8th *December*, 1834, a *ven. ex.* number 38, was issued to the succeeding January Term. This suit was never returned by the sheriff. But on the 8th January, 1835, the sheriff sold the land in controversy, and on the next day executed, and on the 5th August, 1835, acknowledged in open court a deed for the same to the purchaser, Stephen Hinds. This deed was proved to have been found among the papers of Stephen Hinds's administrator, and to have been in Hinds's possession at the August or November court of 1835. It recites a *ven. ex.* tested on the 3d *November*, 1835, as being the one on which sale was made, and contains no receipt for the purchase-money. The *ven. ex.* tested 8th December, 1834, was proved to have been found among the papers of the sheriff to whom it was directed, and was returned by his administrator into the Prothonotary's office 25th March, 1846.

The plaintiffs having offered this deed in evidence, in connexion with the *ven. ex.* No. 38, January 3d, 1835, tested 8th December, 1834, and the registry of the acknowledgment of the deed, the defendants objected to the same being received in evidence, on the ground that there was no authority shown for making the sale—that the *ven. ex.* offered is not the one on which the sale purports to have been made, and contains no evidence that the sale was made on it—that there is no receipt for the payment of the purchase-money—that the lien of the judgment, on which the sale was made, was gone, and that, if the sale was regular, it conveyed no title; and that there is no return of sale on any writ. The evidence offered was rejected by the court, under exceptions. Verdict, and judgment thereon, for the defendants.

In this court the plaintiffs assigned for error the rejection of the foregoing offer of evidence.

*Benedict*, for the plaintiff in error.—1. The lien of a judgment is indefinite. At common law judgment is no lien on lands, because they were not liable to execution. They were made partially liable on *elegit*. The liability to execution on judgment makes what is called the lien of the judgment-creditor. It is the right of the plaintiff to follow the land of defendant that is affected by the act of 1798 : Fetterman *v.* Murphy, 4 Watts, 424.

2. Lien of execution : Commrs. *v.* Stauffer, 1 Watts, 300 ; Boal's Appeal, 2 Rawle, 37 ; Packer's Appeal, 6 Barr, 277 ; Shaffer *v.* Child, 7 Watts, 86.

3. Lands are chattels in Pennsylvania for payment of debts: Bellas *v.* McCarty, 10 Watts, 13.

4. Sheriff had authority to sell, &c. : Strobel *v.* Smith, 8 Watts, 280 ; Patterson *v.* Stewart, 10 Watts, 472 ; Small *v.* Mechley, 1 Rawle, 95 ; Hartman *v.* Stahl, 2 Pa. R. 231.

*J. T. Hale,* contrà.—The deed was not admissible. 1. Because the receipt for the purchase-money was not signed, and no evidence of payment of purchase-money. Without payment, purchaser at sheriff's sale takes no title : Hamilton *v.* Callender, 1 Dall. 420.

2. No authority shown for making the sale, and sheriff's deed cannot be given in evidence without producing the judgment and execution under which the sale was made : Wilson *v.* McVeagh, 2 Yeates, 86 ; Weyand *v.* Tipton, 5 S. & R. 332 ; Hamilton *v.* Speckenagle, 9 S. & R. 212 ; Porter *v.* Neelaw, 4 Y. 108, 1 Peters, C. C. R. 67.

3. The lien of the judgments on which it is alleged the sale was made, had expired before the sale : Robins *v.* Bellas, 2 Watts, 359 ; Meason's Est. 4 Watts, 342 ; Ebright *v.* The Bank, 1 Watts, 397, Purdon, 660, 661, last ed. ; Dietrich's Appeal, 4 Watts, 208 ; Jameson's Appeal, 6 Barr, 280 ; Penn *v.* Hamilton, 2 Watts, 53.

The opinion of this court was delivered by

BELL, J.—The sheriff's deed, offered in evidence by the plaintiffs, was objected to and rejected on two grounds : first, because it was not shown the officer had authority to make sale of the land he professed to convey; and, secondly, that the lien of the judgment, upon which the process offered was founded, had expired by lapse of time. As the latter objection goes to the very root of the plaintiffs' title, it will be convenient first to consider it.

The land in dispute was sold by the sheriff, as the property of George Bell 2d, and, for the purposes of the present inquiry, must be so regarded. The judgment, under which the sale was made, was recovered against him on the the 24th of September, 1829. A writ of *fieri facias sur* this judgment, was issued to November Term, 1829, and levied on the land, which was afterwards condemned by an inquisition held on the 4th of December, 1834. On the 8th of the same month, a *vend. ex.* was issued, by virtue of which the plaintiffs allege the land was sold on the 9th of January, 1835. On the next day a deed was duly executed to Stephen Hinds, the purchaser; and this was acknowledged on the 5th of August, 1835. From this brief statement, it will be perceived,

that more than five years elapsed between the rendition of the judgment and the date of the sheriff's sale. Had subsequent encumbrances intervened in the mean time, they would, undoubtedly, have taken precedence of the first judgment, which, notwithstanding the levy, must have been postponed in their favour. This, and no more, was decided in Jameson's Appeal, 6 Barr, 280, as is shown by the subsequent case of Packer's Appeal, Ib. 277. But when the contest is, simply, between the debtor and creditor, the mere running of time, short of the period necessary to raise a presumption of payment, is not permitted to interpose between the latter and the estate of the former, as a source from whence satisfaction of the judgment may be drawn. In this respect there is no distinction recognised between real and personal estate. Both are equally subject to respond in payment of the recorded debt, when called to do so by legal process, for both are regarded as chattels in reference to their liability to be levied in discharge of judgments recovered against their owner. This point has been more than once considered, and, as I had thought, settled by this court. It will, therefore, be little more than necessary to refer to the cases in which the doctrine has been reviewed, with some slight notice of the reasoning upon which it is based.

As early as the agreement, called fundamental laws, settled in England, between William Penn and the freemen and planters of the province of Pennsylvania, it was established—That all lands and goods should be liable to pay debts, except where there is legal issue, and then all goods and one-third of the lands only. In 1682, the liability was extended, by the legislature of the infant community, to one-half the lands, purchased before the debts were contracted, where there was issue. This principle of liability was further extended in 1688, when it was enacted that all lands and houses of a debtor should be liable to sale upon judgment and execution; with a saving of one year, after judgment obtained, in favour of the mansion tract of the debtor. This statute, which was limited to one year, was re-enacted in 1695, without limitation, and again repeated in substance by the act of 1700, when, I believe, for the first time, the sheriff making the sale was directed to convey the lands sold, under his hand and seal, to the purchaser. The subject was revised, with the addition of many details, by the act of 1705, and subsequent enactments, but without any alteration of the principle upon which the original law was based. Most of these statutes will be found collected in the very elaborate opinion delivered by the late Mr. Justice Kennedy, in Bellas *v.* McCarty,

10 W. 31, to whose researches I am indebted. Under them, the common-law lien of a judgment and the right of the plaintiff to take the lands of the defendant in execution, was perpetual, against all the world. In partial regulation of this lien, statutes were from time to time ordained. Among these, were the statute of frauds and perjuries, of 1772, which, as against *bonâ fide purchasers for value*, took away the common-law relation of the judgment to the first day of the term, and confined it to the time of *signing;* the act of April, 1791, providing for the entry of satisfaction, on the call of the defendant or of a subsequent purchaser; the act of 1794, discharging lands sold by order of the Orphans' Court from the lien or the debts of the intestate; and perhaps some others. Then followed the act of April, 1798, the preamble of which has been supposed to refer to the statutory provisions just cited. It recites that " the provision heretofore made by law for preventing the risk and inconvenience to purchasers of real estate, by suffering judgments to remain a lien for an indefinite length of time, without any process to continue and revive them, had not been effectual," and by its second section enacts, " that no judgment to be thereafter entered in any court of record, shall continue a lien for a longer term than five years from the first return day of the term of which it was entered, unless revived by *sci. fa.* within the said five years. Much difficulty was felt in construing this statute, in reference to the persons and interests to be protected by it. In 1807, Judge Washington, who then presided in the Circuit Court of the United States for this district, after much deliberation, looking to the preamble and the prior state of the law, held that it extended only to the protection of subsequent purchasers for value, and did not include posterior encumbrances. (Hurst *v.* Hurst, 3 Bin. 347, in note.) In 1811, the same question arose in this Court, in The Bank of North America *v.* Fitzsimmons, 3 Bin. 342. After a very able argument, the court, looking to the generality of the enacting clause, and conceiving it to be unrestricted by the language of the preamble, held that the intention was to protect younger judgment-creditors, as well as purchasers. Brackenridge, J., grounds his conclusion on the position that a judgment-creditor, who has trusted his money on the faith of the security, is to be deemed a special purchaser, having an equitable interest in the land. Throughout the discussion by the bar and the bench, no one broached the notion that the act would operate to discharge the land, in favour of the defendant alone. It is true, the case did not call for the expression of an

authoritative opinion upon that point. But had it been supposed the statute worked an entire dissolution of the lien, under all circumstances, the course and character of the discussion must have led to an expression of such an opinion. The very silence of the judges is, therefore, pregnant with meaning, to say nothing of the general direction of their reasoning in negation of such a doctrine.

In a more modern case, however, the exact question was presented under facts involving so peculiar a hardship, imposed on the representatives of the debtor, as might naturally have led the Court to strain a point in their favour, had any room been afforded for the indulgence of sympathetic feeling, or the entertainment of doubt. I allude to Fetterman *v.* Murphy, 4 W. 424. It is unnecessary to cumber this opinion with a statement of the features of that case, further than to say, that a satisfied judgment had been fraudulently revived against the representatives of a deceased debtor, long after the expiring of five years from its rendition, and his estate swept from the heirs by means of executions founded upon it. The leading point of the case was, whether the land could be so levied and sold? The learned Judge who delivered the opinion of the court, after characterizing the steps taken to enforce a second payment of the judgment as a robbery, found the law was too strongly settled to enable the tribunal to afford relief as against one who was no party to the fraud. After considering the rule as it stood before the act of 1798, he proceeded to observe, that act " does not operate on the judgment, but on the lien, that is, on the right to follow the lands and take satisfaction out of them, though such proceeding may affect those who acquired an interest in them after judgment. The right to follow the lands and take the proceeds of them from those who have acquired an interest in them after judgment, is what is affected by the act of 1798. The word ' purchaser' was not introduced because it would have limited the operation and benefit of the act to purchasers, and have excluded from its benefits those who, though not strictly purchasers, had acquired some interest in, or lien on the land after judgment. ' No judgment shall continue a lien,' &c., then, has no relation to the defendant in the judgment; it leaves the rights of the plaintiff as to him precisely as they stood before 1798;—but it limits the rights of a creditor (unless he revives his judgment according to the act and its supplements) to five years, as respects those who purchase or acquire subsequent liens on lands bound by the judgment." I have extracted this passage, not only because it is direct to the purpose, but, being expressive of the judgment of the

whole court, as shown by the succeeding remarks of the Chief Justice, ought to be accepted as decisive of this dispute. It is, in truth, but a recognition of a doctrine I have always understood as perfectly settled since The Bank *v.* Fitzsimmons, and so accepted by every member of the profession. I received, therefore, with some surprise, the intimation that a difference of opinion existed.

But the validity of this sheriff's sale does not altogether depend on the continued existence of the lien of the judgment, irrespective of the levy made under the *fi. fa.* It is not pretended that by a failure to revive the lien by *sci. fa.* the judgment-creditor forfeited his debt. That, at least, still continued to exist against the defendant, and might be enforced against any property possessed by him, provided in so doing the plaintiff did not impinge upon the interests of others. The process issued for the purpose, when levied on the land, became of itself a lien, for this quality is said to be a necessary and inseparable incident of seizure in execution, by the principles of the common law. (Stauffer *v.* Commonwealth, 1 W. 300; Shaeffer *v.* Child, 7 W. 86; Parker's Appeal, 6 Barr, 277.) And this is true, even as against those who acquire an interest in the thing after the levy. In the first of these cases, the Chief Justice observed:—"Property seized is in the custody of the law, the end of which might be prevented if creditors could subsequently acquire a paramount interest in it. In regard to chattels this undoubtedly holds, so far as to afford the creditor an opportunity to obtain satisfaction by a reasonable pursuit of his remedy, and it equally holds in respect of land, which, with us, is a chattel for the payment of debts." As between debtor and creditor, the land of the former is as accessible to the latter, in payment of his debt, as would be a horse or any other personal chattel, and a complaint that either species of property was applied in discharge of an unrevived judgment, is entitled to equal favour. The question, in this aspect of it, has nothing to do with the lien of the judgment. It is simply a question whether the property of a debtor is liable to be sold in satisfaction of an execution issued against him. It would be strange, indeed, if, in Pennsylvania, such a debtor, seised of real estate, could hold his creditor at arms' length, until he had revived his judgment under the act of 1798. True, there ought regularly to be a *sci. fa. post annum et diem;* but this is equally necessary where the object is the seizure of personalty. It is objected there is none such here. Had this objection been made by the defendant in proper time, the execution against him must have been set aside. But it is an irregularity insufficient to avoid the sheriff's sale, and,

therefore, cannot be taken advantage of in this collateral proceeding. Indeed, it lies only in the mouth of the defendant himself, to take the exception in proper time, for he may choose to, and frequently does, waive the writ of *sci. fa.* It is intended for his personal protection. Should he choose to suffer his land to be sold by execution without it, neither he, nor those claiming under him, can afterwards be permitted to call in question the validity of the sale; more especially, this cannot be done, as is here attempted, in a collateral action of ejectment. (Vastine *v.* Fury, 2 S. & R. 476; Baily *v.* Wagoner, 17 S. & R. 327; Spear *v.* Sample, 4 W. 373.)

This part of the case has been considered more elaborately than was perhaps necessary, with a view to put at rest the doubt which seems recently to have arisen.

The remaining objection to the evidence offered may be disposed of in a few words. It is true that a sheriff's sale made without the proper writ is void for want of authority. The judgment and execution must be shown. But the non-return of the latter by the officer will not affect the validity of his conveyance. The omission to make a return of these writs is of very common occurrence, and to hold it essential would, as is remarked in Smith *v.* Mackay, 1 R. 95, be very hurtful to the security of many titles. For all the purposes of information to the court, the sheriff's deed may be considered a return of his proceedings. In the instance in hand, there was a *fieri facias*, levy, and condemnation of the land undisputed. There was also shown in the possession of the sheriff, a *venditioni* commanding the sale of the particular tract in pursuance of the levy. This was followed by a deed regularly executed and acknowledged by the sheriff, conveying the land to the plaintiff's ancestor—afterwards, found in the possession of his representative. This of itself was *prima facie* evidence of a due delivery by the officer, (Hartman *v.* Stahl, 2 P. R. 251,) and payment of the purchase-money; for, as the sheriff has the right to demand and receive payment before delivering his conveyance, it is not to be presumed, in the absence of proof, that he parted with the deed before satisfaction. Delivery being an act regularly subsequent to payment, the presumption accords with the common practice : Scott *v.* Greenough, 7 S. & R. 197; Negley v. Stewart, 10 S. & R. 207. Nor is this presumption rebutted by the want of the usual receipt at the foot of the deed. Upon the question of payment, this is considered as of little importance; and is frequently omitted, as being supplied by the acknowledgment con-

tained in the body of the deed. But I take it the title passes, even without payment, by acknowledgment and delivery of the conveyance. By his return, or, what is equally efficacious, making a deed, the sheriff fixes himself for the price bid. That is a matter, thenceforth, between him and the purchaser. After this, the defendant in the execution can have no title in the land, and it cannot be in the sheriff. It must, consequently, be in the sheriff's vendee: Hartman *v.* Stahl, *suprà*. Now, what is there here to defeat this title? A misrecital of the *venditioni* in the sheriff's deed: nothing more. It is conceded, that, were this writ correctly described in the recital, the title would be perfect. But it is not to be tolerated that a mere clerical mistake like this, probably susceptible of easy explanation were the parties to the sale living, should operate to defeat a proceeding regular in every other respect. Recitals in sheriffs' deeds are of little weight, and are open to correction. Where it is plain they are inaccurate, a fatal effect is not to be ascribed to them. No one, I think, can look at the connected chain of evidence offered, without being convinced of the regularity of this sale. At the very least, the judgment, execution, and deed tended to establish that fact, and all of them ought therefore to have been given to the jury.

Judgment reversed, and a *venire de novo* awarded.

Mr. Justice COULTER dissented as to the first point in the case.